CAROLINE E. BIRD, EXECUTRIX, AND CHARLES W. LANE, EXECUTOR, &C. OF IRA R. BIRD, DECEASED, *v.* JOHN HAMILTON.

The intention of parties to an instrument, when that intention is apparent from the whole instrument, and not repugnant to any rule of law, will control the meaning of a particular word or phrase, unguardedly used, and seeming to indicate a different intention.

It is the intention of parties, rather than the language employed to express their intention, that courts chiefly regard.

Where the question of partnership arises, not with third persons, but between the parties themselves, the agreement out of which the supposed partnership arises, is to be construed as any other instrument between the same parties.

Where a party had failed to perform the preliminary conditions, upon the compliance with which a partnership was to be formed, and the other party to the agreement, to enable him to perform, furnished his own capital, and for a short time carried on the business in the name of the proposed firm, *it was held*, that this was no waiver, and could not entitle the defaulting party to the rights of a partner.

A waiver should not be implied from slight circumstances.

THIS was a bill for an account of copartnership property and effects.

Complainants filed their bill in this Court, June 29th, 1842, stating that, in December, 1839, their testator, Ira R. Bird, and the defendant, had it in contemplation to form a copartnership, for conveying the United States mail from Niles, in the state of Michigan, to Chicago in the state of Illinois; and that, on the twenty-third day of that month, with a view to such contemplated copartnership, Bird bid off a contract for carrying the mail on said route, in four-horse post-coaches, pursuant to the instructions, conditions, and provisions, contained in a contract for carrying said mail, afterwards entered into by Bird and Hamilton of the one part, and the United States of America of the

other part; a copy of which was annexed to the bill. This contract for conveying the mail was to commence on the first day of July, 1840, and to continue in force until June 30th, 1842. That, May 16th, 1840, Bird and Hamilton entered into the following articles of agreement:

" Articles of agreement and contract, made this sixteenth day of May, A. D. 1840, between Ira R. Bird, of Ypsilanti, and John Hamilton, of Birmingham, both of the state of Michigan, witnesseth: That, whereas, the said Bird did obtain from the Post Office Department a contract for conveying the mail, from Niles, in the state of Michigan, to Chicago, in the state of Illinois; and whereas, the said Bird agrees, and hereby does associate the said Hamilton with him in said contract for conveying the mail, which is to commence on the first day of July, A. D. 1840, and to terminate on the thirtieth day of June, A. D. 1842; and whereas, the said Hamilton has, and does agree to super- intend said business personally, in consideration of his receiving two-thirds of the profits or loss of said business, of carrying the said mail and passengers; it is therefore agreed to enter hereby into partnership, for the special business of carrying the mail and passengers between Niles and Chicago aforesaid. The said Bird is to furnish one-third part of the capital or stock for said business, and to receive one-third part of the profits or loss of said busi- ness; and the said Hamilton is to furnish two-thirds of the capital or stock for said business, and to receive two-thirds of the profits or loss of said business. The business to be conducted under the name and style of Bird and Hamil- ton. And whereas, the said Hamilton will have the gene- ral direction of business on the road aforesaid, he there- fore hereby agrees to bind himself to furnish to the said Bird, a full and perfect exhibit of the receipts and expen- ditures appertaining to said business, and pay over to said

Bird *v.* Hamilton.

Bird any surplus in his hands; and the said Bird, if there is a deficit, hereby agrees to pay to the said Hamilton one-third of said deficit. The said parties hereby agree and bind themselves to do all in their power to promote the interest of the Detroit and Chicago line of stages, as it now runs on the Chicago road, and for that purpose, to receive fare through, and to settle balances once a month, if so often required by either party. Neither party to this instrument shall sell his interest without giving to the other the first right of purchase, at the price offered by another. At the expiration of said mail contract, if the said parties do not re-obtain the same, the stock shall be divided, or sold, each party receiving his *pro rata,* to wit, the said Bird one-third, and the said Hamilton two-thirds, of said stock or partnership moneys or effects of every description."

The bill then stated that, to perform their contract with the government, they, in the name of Bird and Hamilton, purchase, and procure to be purchased coaches, horses, and other stock. That some of the coaches were purchased by Bird, of Gilbert & Eaton, of Troy, in the state of New York, and the remainder of the stock of William H. Overton & Co., who held the previous mail contract on the route. That the purchase of Overton & Co., was made by Hamilton in his own name, on account of some misunderstanding and bad feeling existing at the time between Overton and Bird, but for the use and benefit of the firm. That one-fourth of the purchase money was paid down, and the remaining three-fourths were to be paid,—one-fourth on the first day of January, 1841, one-fourth on the first day of April following, and the remaining fourth on the first day of July thereafter; which payments, amounting in all to $6,300, were made, except the first, out of the receipts and profits of the mail contract, and the trans-

portation of passengers. That it was the intention of Bird and Hamilton to borrow, on the credit of the company, the money necessary to stock the road, and to repay it from the receipts of the road; and that the amount necessary for that purpose was borrowed by them. That Hamilton had received on the mail contract about $15,000, and that what had been received from passengers was equal to the expenses of running the road. That the copartnership was carried on by the parties, each devoting his time and attention to it, until October 25th, 1840, when Bird departed this life, leaving a last will and testament, and complainants his executrix and executor. That Hamilton took possession of the coaches, horses, and other stock belonging to the firm, amounting to about $8,000, and the books and other evidences of debt, and excluded complainants from all participation in, and knowledge of the business, and refused to come to any settlement with them.

Defendant, by his answer, denied that in December, 1839, Bird and himself were in consultation to form a copartnership to carry the United States mail, from Niles to Chicago; and stated that there was no consultation relative to such partnership, until March, 1840, when Bird informed him he had, the preceding September, put in proposals to the Post Office Department at the city of Washington, for carrying the mail on said route for two years, commencing July 1st, 1840, at an annual compensation of $8,400; that his proposal had been held under consideration by the department until that present month, when he was notified they would be accepted, if he would abide by them, and take the contract with the terms and conditions annexed to it by the department. Bird also stated that he had, in the mean time, taken another contract, which made it inconvenient for him to attend per-

sonally to carrying out the terms of the government; and he then proposed to enter into a copartnership with defendant, for transporting the mail and passengers on said route, as stated in the bill.   Defendant afterwards went to Chicago, over said route, to see and become acquainted with it, and, on his return, it was agreed a copartnership should be formed between them ; and, on May 16th, 1840, the articles of agreement set out in the bill were drawn up and signed by the parties.   After they had so agreed to become partners, and not before, Bird notified the department that he and defendant would take the contract, which was executed by defendant and Bird of the one part, and the United States of the other part, on the first day of June, 1840.

Defendant admitted some of the stock for carrying on the proposed partnership, consisting of coaches and the like, amounting to $700, was purchased of Gilbert and Eaton, on account of the proposed copartnership.   Bird stated he was going to Washington, New York and Albany, on his own business, and would make any purchases for the proposed partnership, without expense; and, with a view to making such purchases, he was furnished with a certificate of defendant's ability to meet his pecuniary engagements.   On making such purchase, a draft was drawn by Bird for the amount, on the Post Office Department at Washington, to be paid out of moneys to be received on the mail contract, which draft was subsequently paid by the department.

July 1st, 1840, defendant placed upon said route, for the transportation of passengers and the mail, sixteen valuable horses and one coach, worth altogether $1,280, and for that purpose also, about the same time, purchased of William H. Overton & Co., stock to the amount of $6,387. This purchase was not made in defendant's name, for the

reason stated in the bill. The contract for the purchase was made some time previous to July first, and was intended for the proposed copartnership. Its terms were, one-fourth to be paid July 1st, 1840, and the remaining three-fourths to be secured by negotiable promissory notes, payable in six, nine, and twelve months, with responsible endorsers, certified to be good by the Bank of Michigan. After the terms of the purchase had been agreed on, defendant communicated them to Bird, and requested him to provide his third of the money to be paid, and securities to be given, which he wholly failed to do.

Sickness in defendant's family prevented his being at Niles on the first of July, and until the eighth of that month; but he sent the horses and coach above mentioned, under charge of an agent, and requested Bird to be there on that day, that there might be no failure in carrying the mail. Bird was there on the first of July, but Overton & Co. would not permit him, or defendant's agent, to take possession of the property agreed to be purchased of them, until the agreement for the purchase was fulfilled. On the eighth of July defendant arrived at Niles, and found Bird had wholly failed to perform the agreement on his part, and defendant paid Overton & Co. the whole of the first instalment, and gave his endorsed promissory notes for the others, as required by the contract.

Defendant suffered much embarrassment in being compelled to pay the whole of the first instalment; and he then requested Bird to procure the money he was to advance, and to execute securities to him, defendant, for the one-third part of what was still to be paid, when Bird placed in his hands $60, and stated he would endeavor to fulfil his part in August.

In consequence of Bird's failure, defendant was compelled to advance, during the month of July, about $700,

for necessary repairs, and current expenses.   On the 6th day of September, 1840, he called on Bird again, to fulfil the articles of agreement between them of May 16th, when Bird stated it was out of his power to raise the money, or procure the necessary sureties; to which defendant replied that he must perform on his part, or relinquish any interest he might claim to have in the proposed copartnership and mail contract.   In the month of September, defendant had to raise, and expend in the business, about $900 more, in cash; and in the last of September, or beginning of October, he called twice on Bird to fulfil his agreement, when Bird stated he was unable to do so, and that defendant must take the business, and do the best he could with it; and he then relinquished, and gave up to defendant all his interest in the business;—never afterwards made any attempt to fulfil his part of the articles of agreement;—never advanced any money or executed any securities, or pretended to have any interest in the business.

It was not proposed to borrow money on the credit of the company to stock the road, nor was any borrowed on the credit of the company; but the whole capital was furnished as above stated.   The business was not carried on in the name, and for the benefit of Bird and Hamilton. Defendant denies the firm ever had an existence, or that Bird ever expended any money in the business.   The sixty dollars had not been returned to Bird.   There was a replication to the answer, and testimony was taken which it is unnecessary to state, as it sufficiently appears in the opinion of the Court.

*A. D. Fraser*, for complainants.

*J. F. Joy*, for defendant.

THE CHANCELLOR. That part of the answer in which defendant says Bird relinquished to him all his interest in the business, is not responsive to the bill; and, as it has not been proved, must be thrown out of the case altogether.

It is insisted however, on the part of defendant, that the articles of agreement of May sixteenth, did not constitute a partnership, and should be regarded only as a contract for a copartnership to commence *in futuro*. That the furnishing of capital by the respective parties, in the proportion stipulated by the articles, was a prerequisite to the commencement of the partnership. That neither party was bound to furnish his proportion of stock, unless the other was ready and offered to furnish his ; and that Bird never furnished any part of the capital employed in the business, or was acknowledged by Hamilton as a partner.

The agreement of May sixteenth did not, of itself, create a partnership. It was a contract for a partnership to be formed between the parties on the first day of July following. The language, "It is therefore agreed to enter hereby into partnership," imports a partnership in *præsenti*, but no rule of construction is better settled, than that the intention of the parties to an instrument, when that intention is apparent from the whole instrument, and not repugnant to any rule of law, will control the meaning of a particular word, or phrase, unguardedly used, and seeming to indicate a different intention. *Jackson* v. *Myers*, 3 *J. R.* 388 ; *Jackson* v. *Clark*, *Id.* 424; *Ives* v. *Ives*, 13 *J. R.* 235. It is the intention of the parties, rather than the language employed to express their intention, that courts chiefly regard.

On the sixteenth day of May, 1840, the parties agreed to become partners, in a contract with the government for the transportation of the mail between Niles and Chicago,

in four-horse post-coaches, for two years, commencing on the first day of July of that year, and in the transportation of passengers in connection with the mail.   Bird was to furnish one-third of the capital or stock necessary for the business, and Hamilton two-thirds; and the profit and loss were to be divided between them in the same ratio. The business of the partnership could not be entered upon until the first of July.   It was to commence on that day. It seems, therefore, but reasonable that the parties intended the partnership to commence on that day, and not before.   The business required a large capital in horses, coaches, harness, &c. to be furnished by the parties; but when was this capital to be furnished?   The articles of agreement do not, in express terms, fix any particular time, and yet there can be no doubt it was not to be furnished immediately, or before it was wanted for carrying into execution the contract with the government; neither was the partnership to commence until that time.

If this construction of the articles of agreement be correct, it follows, that either party had a right to require the other to furnish his portion of capital, as a *sine qua non* to the formation of the partnership.   Did Bird furnish his part of the capital, or was it waived by Hamilton?   The case must turn upon the answer to be given to these questions.

The contract with government for carrying the mail, and with Gilbert and Eaton for the two coaches, I do not consider partnership contracts, for there was no partnership then in existence.   These contracts were entered into about the first of June, and must be regarded as joint contracts made by the parties, not as partners, but in their individual capacity, with a view to, and for the benefit of, the partnership subsequently to be formed.   By them neither party contributed any thing as capital.   Bird had no

exclusive interest in the mail contract, which was not con-
summated until June first, and after Hamilton had agreed
to become a joint contractor with him.    Neither did he
pay, or agree to pay, for the coaches purchased of Gilbert
and Eaton, with his own money, but gave them a draft on
moneys to be received by the future partnership for carry-
ing the mail.   He consequently contributed nothing as
stock to the partnership, by the part he took in those con-
tracts.

.  If I am correct in the view I have taken of these con-
tracts, Bird never furnished any capital whatever, unless
the sixty dollars he handed to Hamilton are to be consid-
ered in that light, and of that I shall have occasion to speak
hereafter.    Hamilton furnished sixteen horses and one
coach, worth together $1,280, and purchased the stock of
Overton & Co. for $6,387, one quarter of which he paid
in cash, and secured the balance in six, nine, and twelve
months.    The contract with Overton & Co. was made by
Hamilton in his own name, but was intended at the time
for the benefit of Bird as well as himself, on his paying
his third of what was to be paid down, and securing his
third of the payments on which credit was to be given.
This Bird fails to do, and Hamilton had to make the first
payment out of his own funds, and to get two friends to
become his sureties for the future instalments.

Bird was at Niles on the first of July.    He went there
at the request of Hamilton, but he was not then, or at
any other time, ready to perform his part of the contract
between Overton & Co. and Hamilton; which was to be
consummated on that day.    He appears to have taken an
interest in the business at that time, and he undoubtedly
then hoped soon to be able to perform on his part.    Ham-
ilton appears to have indulged a like hope, for he after-
wards applied to him repeatedly for that purpose; and the

books, for something like thirty days, until Hamilton lost all hopes of his ever performing, were kept in the name of Bird and Hamilton, but after that, in the name of Hamilton alone. This circumstance should not be used to the disadvantage of Hamilton. It should not be construed into a waiver of the agreement requiring Bird to furnish a third of the capital. To give such a construction to what was intended as a favor to Bird, and nothing more—that is, to permit him to reap the benefits of a contract, by performing on his part, after the time for that purpose had elapsed,—would be hard indeed, and saying to persons hereafter, in like circumstances, show no indulgence whatever to a defaulting party, or it will be construed into a waiver of your rights.

There is no evidence of a waiver, and it certainly should not be implied from slight circumstances. It is hardly reasonable to suppose Hamilton intended to give Bird the benefit of his services, and of the $8,000 capital invested by him in the business. The complainants seem to have been aware of this difficulty, for they state in their bill the parties were to borrow money on the credit of the firm, to stock the road, and to repay it from their receipts ; and that money was actually borrowed by them for that purpose. The answer positively denies any such understanding, or that any money was borrowed by the firm. And this allegation of the bill is unsupported by testimony, except the evidence of Lorenzo Dow Bird, who says there was an understanding, or agreement, that the money necessary for the *first* payment should be borrowed on the credit of the firm ; and he thinks some three hundred dollars were borrowed of a bank in Jackson. The witness is not positive any money was borrowed ; he *thinks* it was borrowed ; and the agreement or understanding to which he testifies is not only denied by the answer, but is

in direct contravention to the articles of agreement, which speak of capital or stock, and not of credit.

Hamilton gave receipts in the name of Bird and Hamilton, for the mail money, from time to time, as it became due, and they are adduced as evidence of a partnership. Hamilton and Bird, as already stated, were joint contractors for carrying the mail. Suppose Bird, after making the contract, had refused to have any thing to do with carrying the mail, and Hamilton, as he was equally liable with Bird for a non-performance of their contract, to save himself, had gone on and fulfilled the contract with the government; would he not have been entitled to the mail money? And would he not have given receipts in the name of Bird and Hamilton? The case supposed is the one before the Court, if Bird, by reason of his failure to comply with the articles of agreement, was not a partner with Hamilton.

As to the sixty dollars, Hamilton did not receive it as performance of the articles of agreement by Bird, who, at the time he paid it, promised to pay the balance of his share of the first payment, and to furnish his part of the securities. It was not intended by the parties to secure the rights of Bird under the articles, unless the promise made at the same time was afterwards performed.

The question is one of partnership between the parties themselves, and not as to third persons. Individuals, who are not partners in fact, are sometimes liable as partners to third persons, on account of holding themselves out to the world as partners. But that is not the question in the present case, which is one of partnership between the parties; and, when that is the case, the agreement out of which the supposed partnership arises, is to be construed as any other agreement between the same parties.

The present case is not, I confess, without its difficul-

ties.    It is peculiar in many of its features, but, after the best consideration I have been able to give it, I am of opinion that Bird and Hamilton were not partners under the articles of agreement of May sixteenth, by reason of Bird's failure to furnish his share of the stock.    *McGraw* v. *Pulling*, 1 *Freeman R.* 357.

Bill dismissed, but without costs, as complainants are executors, and appear to have acted in good faith in bringing their suit.